NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| AMERICAN HI-TECH PARK, LLC<br><br>*Plaintiff*,<br><br>v.<br><br>SUNRISE DEVELOPMENT, INC., a Virginia Corporation; SUNRISE SENIOR LIVING, INC., a Virginia Corporation; John Doe Companies 1-100,<br><br>*Defendants*. | Civ. Action No. 09-4752 (KSH)<br><br>OPINION |

**Katharine S. Hayden, U.S.D.J.**

Plaintiff American Hi-Tech Park, LLC ("AHTP") filed this breach of contract action as a result of the failed Purchase and Sale Agreement it had entered into with Sunrise Development, Inc. ("SDI"). Defendants SDI and Sunrise Senior Living, Inc. ("SSLI") have now filed a motion for summary judgment dismissing AHTP's suit in its entirety. The Court has reviewed the parties' written submissions and held oral argument, and for the reasons set forth below, will grant the motion in part and deny it in part.

**I. Background**

AHTP is the owner of the 23.88 acres of real property at issue. (Pl.'s Opp. Br. 2.) Samuel Massuci is the majority owner and managing partner of AHTP, and has been a real estate developer for 50 years. (Defs.' Statement of Undisputed Material Facts ("SUMF") ¶ 2.) SDI is a developer of senior living facilities and was the intended purchaser of the subject property. (*Id.*

1

at ¶ 3.)  SSLI is a publicly traded company, incorporated in Delaware, which does business as the parent company of a number of entities including SDI.  (*Id.* at ¶¶19–20.)

    A.  *The Subject Property*

The property straddles the municipal boundaries of Hanover Township (the "Township") and the Borough of Morris Plains (the "Borough").  (Compl. ¶ 8.)  The majority of the property, 18.23 acres, is located in the Township and the remaining 5.25 acres is in the Borough.  (*Id.* at ¶¶ 9–10.)  Massuci began his efforts to develop the property as early as 1985.  (*Id.* at ¶ 19.)  He faced numerous obstacles from the New Jersey Department of Environmental Protection ("NJDEP") as a result of the passage of the Freshwater Wetlands Protection Act, and actively litigated whether the property was exempt from the Act. (*Id.* ¶¶ 18, 23–33.)  Ultimately, Massuci and the NJDEP reached a settlement in 2002, which required AHTP to complete certain site improvements by September 20, 2009 or otherwise forfeit its right to develop the property.  (*Id.* at ¶ 35.)

Massuci also faced continuous opposition from the Township, which sought to use eminent domain to condemn the property for open space. (*Id.* at ¶¶ 39–54.)  In 2004, AHTP filed suit to challenge the Township's efforts.  (*Id.* at ¶ 55.)   In 2006, Massuci began negotiating with SDI over the potential development of the property into a senior living facility. (Pl.'s Counter Statement of Undisputed Material Facts ("Counter SUMF") ¶ 3.)  As part of their negotiations, AHTP and SDI presented a proposal whereby the Township would permit SDI to build a senior living facility on approximately 4 acres of the property, and in return the remaining acres would be dedicated as open space. (*Id.* at ¶ 4.)  The Township accepted and entered into a settlement agreement with AHTP on January 11, 2007 for a proposed development that included the SDI concept plan as an exhibit. (*Id.* at ¶ 6.)

B. *The Purchase and Sale Agreement*

On February 21, 2007 AHTP and SDI executed a purchase and sale agreement (the "PSA"), in which SDI agreed to purchase the property for $4 million. (Compl. ¶ 75, 77.) Paragraph 5.3 of the PSA states in pertinent part:

> Purchaser, at its sole cost and expense, within sixty (60) days of the expiration of the Feasibility Study Period, shall submit, and diligently prosecute an application or applications ("Applications"), as necessary to the appropriate authorities to obtain all necessary Approvals (as defined in Paragraph 5.6 of this Agreement) relating to Purchaser's Intended Use of the Property. . . . **Purchaser recognizes and agrees that any submission to the appropriate authorities must be in conformance with the Settlement Agreement attached as Exhibit C.**

(Decl. of Susan Timoner, Ex. A, PSA ¶ 5.3 (emphasis added).)  Attached as Exhibit C to the PSA is AHTP's Settlement Agreement with the Township.  That Agreement states:

> The Township will adopt an amendment to its Land Use Ordinance to permit [AHTP], its heirs and assigns, to construct a 160 Unit assisted living/independent living unit facility ("Senior Living Facility") consisting of 120 independent living units and 40 assisted living units on the Subject Property with a layout generally in accordance with the concept site plan attached hereto.

(*Id.* PSA, Ex. C, Township Settlement ¶ 1.) It further states that:

> In connection with Site Plan approval the following items are **stipulated and shall be included in the application**:
>
> > (b) As a condition of Site Plan approval[, AHTP], or their heirs and assigns shall satisfy **any** [of the] Township's Fair Housing Growth Share obligations **on site** as set forth in the Township's Fair Housing Growth Share Ordinance and regulations promulgated by the Council on Affordable Housing which are generated by the creation of the 160 [unit] Senior Living Facility.

(*Id.* at ¶ 6(b) (emphasis added).)

In accord with the Settlement Agreement, the Township amended the necessary Land Use Ordinance on February 8, 2007, prior to the execution of the PSA, to permit SDI's planned senior living facility development. (Decl. of James M. Turteltaub, Ex. H.)  The amended

3

Ordinance contains language that mirrors the stipulated requirement in the Settlement Agreement. Specifically, paragraph 12 states:

> Affordable Housing. The developer of any independent/assisted living facility shall address the Township's obligation for affordable housing resulting from the development by providing affordable units on the same site and as part of the same development. The number of units that constitute the obligation shall be determined by the rules of the New Jersey Council on Affordable Housing in effect at the time that the building permits are issued for the development.

(*Id.* at Ex. H, ¶ 12.)

Significantly, the PSA includes a liquidated damages provision which limits the amount of damages AHTP may collect in the event SDI breaches the contract.

> If purchaser defaults in its performance of any term, covenant, condition, or obligation under this Agreement, including the obligation of Purchaser to purchase the property if all conditions precedent to such obligations have been satisfied Seller shall be entitled to . . . bring suit for damages suffered by reason of Purchaser's default, not to exceed One Hundred Thousand ($100,000) Dollars. **Seller waives all other remedies.**

(Decl. of Susan Timoner, Ex. A, PSA ¶ 12.3 (emphasis added).)

### C. The June 15, 2007 Environmental Remediation Letter Agreement

In June of 2007, the parties exchanged letters addressing issues ancillary to the purchase and development of the property. (*See* Decl. of Susan Timoner, Ex. B, June 15, 2007 letter; James Turteltaub Letter, February 2, 2012, Exs. A & B, June 14, 2007 Letters.) On June 14, 2007, counsel for SDI sent a self-described "letter amendment" to AHTP to "confirm certain matters relative to the Contract" between the parties. (James Turteltaub Letter, February 10, 2012, Ex. A, June 14, 2007 Letter Amendment.) [1] The letter covered three matters: A) it confirmed the mailing of a June 14, 2007 title objection letter as prescribed by "Paragraph 3" of the PSA (*See* James Turteltaub Letter, February 10, 2012, Ex. B, June 14, 2007 Title Objection

---

[1] During oral argument the Court requested AHTP submit the June 14, 2007 letters, which the June 15th Letter Agreement at issue references, to aid the Court in deciding the pending motion.

4

Letter); B) it represented SDI's waiver of the right to terminate the PSA pursuant to Paragraph 5.5 of the PSA, which was related to the Feasibility Study Period; and C) it limited SDI's liability for remediation costs to $200,000, while indicating that SDI remained responsible for the cost of any and all "natural resource damages" and obtaining the required final, non-appealable approvals from the NJDEP "at its sole cost and expense." (*Id.*)  With respect to issue "C" the letter went on to state:

> The terms of this letter amendment shall in no way modify the terms of Paragraph 5.6 of the Contract, it being expressly understood that NJDEP approvals shall remain an "Approval" required to be procured within the ambit of Paragraph 5.6 of the Contract.

(*Id.*)  The letter concluded by stating:

> Seller and Purchaser hereby ratify and confirm the balance of the terms and conditions of the Contract, except those inconsistent with this letter in which case the terms of this letter amendment shall control.
>
> If the forgoing is acceptable to the Seller, please sign where indicated below and return to me.

(*Id.*)

AHTP sent a written response to the June 14, 2007 Letter Amendment and Title Objection Letter on June 15, 2007.  (*See* Decl. of Susan Timoner, Ex. B, June 15, 2007 letter.) After addressing the title objection issues, and accepting SDI's waiver of the right to terminate the PSA pursuant to Paragraph 5.5, AHTP disagreed with the proposed language for a contract provision addressing the remediation issue, and made this counter proposal:

> The environmental issues raised in the initial and expanded Phase I reports shall be remediated by the Buyer. The remediation shall occur and be processed concurrently with the site plan and subdivision application to be processed by the Buyer.  Buyer shall only be responsible for remediation which may be required within the 4-acre parcel to be acquired by the Buyer.  With reference to the cost of on-site remediation, the first $200,000 in costs is to be paid by the Buyer. Additionally costs of $200,000 and less and [sic] $400,000 are the responsibility of the Seller.  Any costs greater than $400,000 shall be the sole responsibility of

> the Buyer. Seller agrees to provide his services and assistance in connection with all aspects of the approval process at no charge to the Buyer.

(*Id.*) SDI's counsel wrote "agreed" on the bottom of AHTP's letter and signed and dated it. (*Id.*)

### D. The Site Access/Work and Indemnification Agreement

To facilitate SDI's responsibility to complete the necessary remediation work before closing on the property as provided in the June 15, 2007 letter, the parties entered into a Site Access/Work and Indemnification agreement in July of 2008. (*Id.* at Ex. C, Site Access/Work and Indemnification Agreement.)[2] The agreement references the "contract of sale" between the parties and notes that "Owner agrees to convey the Property to Purchaser on or before January 5, 2009." (*Id.*) It further states that

> Owner grants Purchaser access to the Property prior to the time of closing to access the Property, to perform site work, wetlands and remediation work in connection and compliance with the approved site plan and terms set forth in the aforementioned Approvals, together with all relevant County, State and utility authority approvals rules, regulations and standards.

(*Id.* at Ex. C ¶ 1.) The agreement also included a provision that contemplates what will happen if SDI fails to close on the property.

> In the event that the closing does not take place, and/or if required by an governing agency or Owner, Purchaser agrees to restore the Property to the condition that it was in prior to commencement of work on the Property, which shall include, but not be limited to, the removal of all structures and improvements at the election of Owner. All restoration and removal shall occur within a reasonable time of the closing failing to be realized.

(*Id.* at Ex. C ¶ 5.)

### E. The Borough Developer's Agreement

---

[2] At oral argument, counsel explained that a year passed between the June 15, 2007 Agreement and the subsequent Site Access Agreement because an intermediary agreement with NJDEP defining exactly what remediation work would be required on the site was entered into in March of 2008. Once the required work was defined by the NJDEP, the parties negotiated the Site Access Agreement so that SDI could begin work prior to closing on the property.

Also in July of 2008, AHTP and SDI signed a development agreement with the Borough. (*See* Decl. of Susan Timoner, Ex. D, Borough Developer's Agreement.) The agreement set forth the conditions that had to be fulfilled by AHTP and SDI before the Borough would give final site plan approval. (*Id.*)

F.  SDI Terminates the PSA

Notwithstanding the foregoing "go ahead" understandings, on December 4, 2008, SDI sent a letter to AHTP formally terminating the PSA. (*Id.* at Ex. 6, Termination letter.) The stated reason was SDI's inability to reach an agreement with the Township over the number of "'COAH units' that must be built on site." (*Id.*)

> Because of the number of on site COAH units required by Hanover, and the restricted rentals imposed by Regulations covering these COAH units, Sunrise cannot build the 120-units of independent living and 40-units of assisted living.
>
> Thus, Sunrise elects to terminate the Purchase and Sale Agreement.

(*Id.*)  The letter also notes that "[a]lthough not discussed, I know that your client is aware of what has happened in the credit markets over the last six (6) months."

SDI posited a legal right to terminate based on specific portions of the PSA.  Paragraph 5.6(a), after discussing the necessary approvals, states that:

> Seller and Purchaser hereby agree that Purchaser's obligation to purchase the property is expressly contingent upon Purchaser procuring on behalf of Purchaser . . . all final non-appealable site plan approvals, subdivision approvals, developer's agreements, zoning, licensing, and all other permits . . . necessary for the Purchaser's Intended use (collectively, the "Approvals"). . . . In connection with the Approvals, such contingencies shall not be deemed satisfied if Purchaser, by virtue of any such Approvals, is required to construct off-track or off-site improvements **or such approvals impose any such conditions, which, in Purchaser's sole discretion, are unacceptable to Purchaser**.

7

(*Id.*)  Relying on the highlighted language, SDI argued that the number of COAH units required by the Township was unreasonable and made the development economically unfeasible, and therefore constituted an unacceptable condition. (*See id.*)

As an alternative avenue for termination, the letter cites to paragraphs 9.1(f) and 9.4, which state:

> 9.1   In addition to all other conditions contained elsewhere herein, the obligations of Seller to sell and Purchaser to purchase the Property are subject to the following subparagraphs:
>
> . . .
>
> (f)  The Property shall be properly zoned or other necessary use and other variances and engineering and other permits shall have been obtained by the Purchaser to allow construction of Purchaser's Intended Use.
>
> . . .
>
> 9.4   In the event that any of the conditions precedent to Purchaser's obligations set forth in this Agreement are not satisfied, Purchaser shall have the right, in its sole discretion, to terminate this Agreement by written notice to Seller.

(*Id.*)  SDI argued that because it could not come to an agreement with the Township on the COAH units, the necessary permits were not obtained, and so in its sole discretion it could terminate the agreement pursuant to paragraph 9.4.  (*See id.*)

   G. *The Pending Case*

AHTP's complaint is comprised of five counts: Count I, seeking specific performance of the PSA; Count II, seeking damages for breach of the PSA; Count III, seeking damages for breach of the June 15, 2007 Letter Agreement; Count IV, seeking damages for breach of the Borough Developer's Agreement; and Count V, seeking to impose single enterprise liability to hold SSLI liable for SDI's breach.

At oral argument, AHTP informed the Court that it had abandoned Count I, seeking specific performance of the PSA, and agreed that damages for breach of the PSA are capped at $100,000 by the limitations in paragraph 12.2. AHTP strongly argued, however, that SDI is liable for additional damages on grounds that the June 15, 2007 Letter Agreement is an enforceable agreement between the parties separate and apart from the PSA, entered into for additional consideration and assurance. When the Court asked why AHTP had not cross-moved for summary judgment on the issue of breach of the PSA and/or the other supposed agreements, AHPT asserted that factual issues remained unexplored that needed to be presented to the Court before it could make a properly supported dispositive motion.

SDI argued, as it had in its briefs, that it properly terminated the PSA and therefore was not liable for breach. Further, it argued that the June 15, 2007 letter was an amendment to the PSA and part of the PSA, so even assuming SDI breached its obligations in the letter, its liability was covered by the liquidated damages clause in paragraph 12.2. Moreover, SDI argued that pursuant to New Jersey law, a Developer's Agreement cannot be construed as an independent contract and that AHTP had failed to allege facts to substantiate its claim that SDI and SSLI are a single enterprise.

**II. Standard of Review**

Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The role of the court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). The moving party bears the burden

of showing no genuine issue of material fact, and the non-moving party opposes the motion by presenting affirmative evidence to the contrary. *Id.* at 256–57. A factual dispute is genuine if a reasonable jury could find in favor of the non-moving party and it is material only if it bears on an essential element of the plaintiff's claim. *Fakete v. Aetna, Inc.,* 308 F.3d 335, 337 (3d Cir. 2002).

When deciding a summary judgment motion, a court must "'view the record and draw inferences in a light most favorable to the non-moving party.'" *Knopick v. Connelly*, 639 F.3d 600, 606 (3d Cir. 2011) (quoting *In re IKON Office Solutions, Inc.,* 277 F.3d 658, 666 (3d Cir. 2002)). However, "the nonmoving party may not, in the face of a showing of a lack of a genuine issue, withstand summary judgment by resting on mere allegations or denials in the pleadings; rather, that party must set forth specific facts showing that there is a genuine issue for trial." *United States v. 717 S. Woodward St.,* 2 F.3d 529, 533 (3d Cir. 1993) (internal quotations and citations omitted).

### III. Analysis

#### A. SDI and SSLI Are Not a Single Enterprise

Count V of the Complaint alleges that SDI is the alter-ego of SSLI, and thus SSLI should be held liable for SDI's breach because the two operated as a single enterprise. (Compl. ¶¶ 198–213.)

A party seeking to pierce the corporate veil and hold a parent company liable for the actions of its subsidiary bears the burden of establishing that the corporate form should be disregarded. *Richard A. Pulaski Constr. Co. v. Air Frame Hangars, Inc.,* 195 N.J. 457, 472 (2008). To prevail under New Jersey law AHTP must demonstrate that "(1) 'the parent [SSLI] so dominated the subsidiary [SDI] that it had no separate existence but was merely a conduit for

the parent' and (2) 'the parent has abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise to circumvent the law.'" *Craig v. Lake Asbestos of Quebec, Ltd.,* 843 F.2d 145, 149 (3d Cir. 1988) (quoting *State, Dep't of Envtl. Protection v. Ventron Corp.,* 94 N.J. 473, 501 (1983)). "The issue of piercing the corporate veil is submitted to the factfinder, unless there is no evidence sufficient to justify disregard of the corporate form." *Verni ex rel. Burstein v. Harry M. Stevens, Inc.,* 387 N.J. Super. 160, 199 (App. Div. 2006) (citations omitted). Viewing the facts in the light most favorable to AHTP, it has failed to present evidence sufficient to demonstrate a material issue of fact with respect to both elements of the claim.

When evaluating the two elements of the single enterprise claim in the parent-subsidy context, courts consider a number of factors:

> gross undercapitalization . . . failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders.

*Craig,* 843 F.2d at 150. At oral argument, AHPT maintained that SDI and SSLI acted as one entity, and at times it was unclear which AHTP was dealing with. In its opposition brief, AHTP points to various actions that allegedly led it to believe SSLI was a party to the contract. (Pl.'s Opp. Br. 35–40.) Specifically, AHTP notes that SDI has not filed federal tax returns in the last five years, does not prepare its own financial statements, does not maintain any bank accounts, does not have separate insurance coverage, and has only built senior living facilities for SSLI. (*Id.* at 36.) AHTP also points to the fact that there was confusion as to which persons were employed by SDI or SSLI and that SSLI representatives were present during the AHTP/SDI

11

presentation to the Township in which the settlement and senior living facility development was proposed. (*Id.* at 37–38.)

While these facts may arguably create an issue of fact as to whether SSLI "so dominated [SDI] that it had no separate existence," AHTP has failed to present any evidence in its brief to suggest that SSLI "abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise to circumvent the law." *Craig,* 843 F.2d at 149. In essence, AHTP has made no effort to address the second element of the claim either in its brief or at oral argument. As the Third Circuit observed, "[i]t is patently clear since *Ventron* that in New Jersey even the exercise of significant control by the parent over the subsidiary will not suffice to pierce the corporate veil." *Id.* at 150.

AHTP cites to this Court's earlier decision denying a motion to dismiss SSLI for lack of subject matter jurisdiction. In concluding that jurisdiction existed the order states that the "evidence presented indicates a deliberate, targeted identification of SSLI with SDI sufficient to pierce the corporate veil." (Pl.'s Br. 35; Decl. of Turteltaub, Ex. N, Opinion at 18, 20–21.) As SDI and SSLI correctly note in reply, however, this Court's prior ruling cannot be construed to support piercing the corporate veil at this juncture, because the ruling related only to whether there was sufficient factual support *in the pleadings* for the court to exercise jurisdiction.

Because AHTP has failed, after conducting discovery, to proffer evidence to support the second element of the veil piercing claim, it must be dismissed and the Court will grant summary judgment with respect to Count V.

### B. Breach of Contract Claims

AHTP has abandoned Count I of the complaint seeking specific performance of the PSA, but Counts II through IV allege separate breaches of the PSA, of the June 15, 2007 Letter

Agreement, and of the Borough Developer's Agreement respectively. As a basis for making these claims, AHTP maintains that each negotiated understanding is a separate and independent contract that SDI's actions breached. Thus, AHTP is entitled to damages beyond the cap of $100,000 set in paragraph 12.2 of the PSA.

1. Was the Developer's Agreement an Independently Enforceable Contract?

In Count IV of the complaint, AHTP argues that by failing to go through with the purchase of the property pursuant to the PSA, SDI breached the terms of the Borough Developer's Agreement, which required it to post bonds and perform certain work in order to receive final site approval. (Compl. ¶¶ 192–97.)

The Court disagrees. As SDI has argued, it is a settled principle of New Jersey law that "a developer's agreement is not . . . an independent contractual source of obligation." *Toll Bros., Inc. v. Bd. of Chosen Freeholders of the Cnty. of Burlington,* 194 N.J. 223, 249 (2008). "[A] developer's agreement is an ancillary instrument, tethered to the conditions of approval, and exists solely as a tool for the implementation of the resolution establishing the conditions." *Id. See also S. Brunswick Ctr., L.L.C. v. Twp. of S. Brunswick*, 2009 WL 5062336, at *6 (App. Div. Dec. 28, 2009) ("A developer's agreement is not an independent source of rights . . . ."); *Majestic Contracting, LLC v. Nunziato,* 2011 WL 5599645, at *5 (App. Div. Nov. 18, 2011) ("The Court recognized [in *Toll Bros.*] that '[b]y its very nature, a developer's agreement is not . . . an independent contractual source of obligation,' but that 'its purpose is to help carry out the conditions imposed by the Board.'" (internal citation omitted)).

The Developer's Agreement was not a separate and independently enforceable agreement, but rather was ancillary to the PSA and outlined the conditions SDI had to meet to receive final site approval from the Borough. Applying settled law on the nature of developer's

agreements, the Court finds that SDI was required to fulfill the requirements of the Developer's Agreement in completing its development project but cannot be said to have breached the Developer's Agreement for failure to undertake the project at all.

Based on the foregoing, there is no genuine issue of material fact to preclude this Court from granting summary judgment in favor of SDI with respect to Count IV.

2. Was the June 15, 2007 Letter Agreement a Separate Contract?

AHTP claims that SDI breached the terms of the June 15, 2007 Letter Agreement by failing to contribute its share of the costs of required environmental remediation, i.e., the first $200,000 and then any costs in excess of $400,000. AHTP contends that the June 15, 2007 letter imposing this obligation on SDI is a contract independent of the PSA and its liquidated damages provision. (Compl. ¶¶ 180–88.) For its part, SDI maintains that the remediation agreement is an amendment to the PSA, unambiguously reflected in the language of the June 15, 2007 letter, and as such, on Count III SDI is entitled to summary judgment in its favor. (Defs.' Br. 8–10.)

"The polestar of contract construction is to discover the intention of the parties as revealed by the language used by them." *Karl's Sales and Serv., Inc. v. Gimbel Bros., Inc.*, 249 N.J. Super. 487, 492 (App. Div. 1991), *cert. denied* 127 N.J. 548 (1991) (citing *Jacobs v. Great Pac. Century Corp.,* 104 N.J. 580, 582 (1986); *Kearny PBA Local # 21 v. Kearny*, 81 N.J. 208, 221–22, (1979); *Atl. N. Airlines, Inc. v. Schwimmer*, 12 N.J. 293, 301 (1953); *Casriel v. King*, 2 N.J. 45, 50 (1949)). "To this end, the language used must be interpreted 'in accord with justice and common sense.'" *Id.* (quoting *Krosnowski v. Krosnowski*, 22 N.J. 376, 386–87 (1956)). As the New Jersey Supreme Court noted:

> In the quest for the common intention of the parties to a contract the court must consider the relations of the parties, the attendant circumstances, and the objects they were trying to attain. An agreement must be construed in the context of the

circumstances under which it was entered into and it must be accorded a rational meaning in keeping with the express general purpose.

*Tessmar v. Grosner*, 23 N.J. 193, 201 (1957).

Therefore, contract terms must be given their "plain and ordinary meaning." *M.J. Paquet, Inc. v. N.J. Dept. of Transp.*, 171 N.J. 378, 396 (2002). "Words and phrases are not to be isolated but related to the context and the contractual scheme as a whole." *Republic Bus. Credit Corp. v. Camhe-Marcille*, 381 N.J. Super. 563, 569 (App. Div. 2005). "'Effect, if possible, will be given to all parts of the instrument and a construction which gives a reasonable meaning to all its provisions will be preferred to one which leaves a portion of the writing useless or inexplicable.'" *J.L. Davis Assocs. v. Heilder*, 263 N.J. Super. 264, 271 (App. Div. 1993) (quoting *Goldberg v. Commercial Union Ins. Co. of N.Y.*, 78 N.J. Super. 183, 190 (App. Div. 1963)).

Moreover, when a contractual dispute involves more than one writing, "'all writings forming part of the same transaction are interpreted together.'" *Nester v. O'Donnell,* 301 N.J. Super. 198, 210 (App. Div. 1997) (quoting *Barco Urban Renewal Corp. v. Housing Auth. of Atlantic City*, 674 F.2d 1001, 1009 (3d Cir. 1982)). "[T]wo or more writings may constitute a single contract even though they do not refer to each other. Whether two writings are to be construed as a single contract, however, depends on the intent of the parties." *Alpert, Goldberg, Butler, Norton & Weiss, P.C. v. Quinn,* 410 N.J. Super. 510, 533 (App. Div. 2009) (quoting *Van Oram v. Am. Ins. Co.,* 680 F.2d 301, 306 (3d Cir. 1982)).

The plain language of the June 15, 2007 letter makes clear it was intended to serve as an amendment to the PSA. First, the letter expressly refers to AHTP as "Seller" and SDI as "Buyer," establishing that its content relates to the underlying contract to purchase the property. (Decl. of Susan Timoner, Ex. B, June 15, 2007 Letter). Second, the letter states that it is responding to the "letter amendment of June 14th" sent by SDI. (*Id.*) Third, the letter expressly

amends the PSA by stating that "Seller agrees to Buyer's waiver of its right to terminate pursuant to Paragraph 5.5" and by appending a new provision to the PSA which makes SDI responsible for certain costs of necessary environmental remediation. (*Id.*) Finally, the letter was signed by a representative of SDI and marked "agreed," demonstrating SDI's assent to the waiver of paragraph 5.5 and the additional remediation language. (*Id.*)

AHTP argues, however, that the June 15, 2007 Letter Agreement did not use the same explicit language as prior letters between the parties to indicate it was intended to be a part of the PSA. For example, a prior letter from June 1, 2007, included language expressly stating it was an amendment to "the Contract between our clients." (*See* Decl. of James M. Turteltaub, Ex. K, June 1, 2007 letter.) But the force of this argument is countered by the fact that the June 15th letter was a response to SDI's June 14, 2007 Letter Amendment, which expressly stated it was a "letter amendment" concerning matters related "to the Contract between" AHTP and SDI. (James Turteltaub Letter, February 10, 2012, Ex A.) Moreover, the June 14, 2007 letter concludes by stating:

> Seller and Purchaser hereby ratify and confirm the balance of the terms and conditions of the Contract, except those inconsistent with this letter in which case the terms of this letter amendment shall control.

(*Id.*)

AHTP's June 15, 2007 letter responded to the June 14th "letter amendment" by addressing SDI's title objections, agreeing to SDI's waiver of the right to terminate the PSA under Paragraph 5.5 and disagreeing with the language SDI proposed with respect to environmental remediation. (*See* Decl. of Susan Timoner, Ex. B, June 15, 2007 Letter). As quoted in its entirety above, in the June 15th letter AHTP's counsel sets forth alternative

16

language detailing each parties' remediation responsibilities and SDI consented to this revised term by signing the letter.  (*Id.*)

It is clear from the language of the June 14, 2007 letter that it was intended to amend certain parts of the PSA and to otherwise confirm the balance of the contract.  The June 15, 2007 letter manifested AHTP's assent to all but one of the proposed amendments in the June 14th letter and provided alternative language for the proposed term with which it did not expressly agree.  The two letters, then, must logically be construed together, and as a whole the two letters amend the PSA by waiving SDI's right to terminate under 5.5 and adding a term reflecting each parties' financial responsibility for environmental remediation. The letters contemplate the same underlying transaction as the PSA—the purchase of the property—and thus must be construed as part and parcel of the PSA.  To argue that the June 15, 2007 "counter-amendment" letter should not be incorporated into the PSA because it does not specifically refer "to the contract between the parties" is contrary to the apparent intent of the letter drafter and the SDI representative that agreed to the letter's terms, and illogical in light of the language of the June 14, 2007 letter and the course of conduct between the parties—writing letters to effectuate amendments to the overarching contract.

Further, AHTP's argument that the June 15, 2007 Letter Agreement bound SDI to complete remediation work before closing on the property whether or not it actually purchased it, is irrational.  In arguing this point at oral argument, AHTP consistently noted that the agreed to provision states that SDI "shall" complete the remediation, but such an argument does not address the language of the next sentence which states SDI "shall" only be responsible for remediation within the parcel of land "to be acquired."   (*See* Decl. of Susan Timoner, Ex. B.) Further, the Site Access/Work Agreement, which granted SDI access to the site so that it could

begin the remediation before closing, clearly articulates that SDI was only required to complete the remediation if it went through with the purchase. (*See* Decl. of Susan Timoner, Ex. C.) Paragraph 5, fully quoted above, explains what will happen if SDI fails to purchase the property, namely that SDI "agrees to restore the Property to the condition that it was in prior to the commencement of the work on the Property." (*Id.*) The plain language of this provision runs contrary to AHTP's assertion that the intent of the parties required SDI to complete the remediation and site work whether or not it actually purchased the property.

The June 15, 2007 Letter Agreement, in conjunction with the June 14, 2007 Letter Amendment, plainly refer to and amend the PSA, therefore this Court will construe the June 15, 2007 Agreement as part of the PSA. In turn, any damages for breach of the terms of the June 15, 2007 Letter Agreement are subject to the PSA limitation on damages, paragraph 12.2. Because the Letter Agreement is not a separately enforceable contract, SDI is entitled to summary judgment on Count III of the complaint. AHTP's claim for breach of the June 15, 2007 Letter Agreement is dismissed.

### 3. Did SDI Breach the PSA?

In oral argument, AHTP agreed that if SDI breached the PSA its damages were limited by the liquidated damages clause of paragraph 12.2 to $100,000.[3] As the Court has construed the June 15, 2007 Letter Agreement as part of the PSA and concluded that the Developer's Agreement is not a separately enforceable agreement, the only remaining issue is Count II, whether SDI's actions in failing to follow through with the purchase of the property breached the

---

[3] New Jersey courts have consistently held that "liquidated damages provisions in a commercial contract between sophisticated parties are presumptively reasonable and the party challenging the clause bears the burden of proving its unreasonableness." *Metlife Capital Fin. Corp. v. Washington Ave. Assocs. L.P.,* 159 N.J. 484, 496 (1999) (citing *Wasserman's Inc. v. Twp. of Middletown,* 137 N.J. 238, 252–53 (1994)). It is worth mention that neither in its brief nor at oral argument did AHTP make any arguments or present any facts that would demonstrate the liquidated damages clause in the PSA is unreasonable. Thus SDI is entitled to summary judgment on the provision's applicability regardless of AHTP's concession.

terms of the PSA such that AHTP is entitled to damages not to exceed $100,000.  AHTP chose not to cross-move for summary judgment on this issue based on the existence of material factual disputes.  In particular, the parties dispute what was known about the COAH requirement at the time the PSA was entered into, how and when the law affecting the COAH requirement changed, and whether changes in the law are relevant to the contract dispute. These issues were not addressed with any depth in the parties' briefs on this motion.  Therefore, the Court denies summary judgment with respect to Count II, breach of the PSA.

## IV. Conclusion

Summary judgment is granted to SDI with respect to Counts I, III, IV, and V of the complaint and denied with respect to Count II.  An appropriate order will be entered.

March 26, 2012                                               /s/ Katharine S. Hayden
                                                                          Katharine S. Hayden, U.S.D.J.